Filed 2/25/21  In re F.W. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| IN RE F.W., <br><br> A Person Coming Under The Juvenile Court Law. <br> _____ <br><br> L.W., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF VENTURA COUNTY, <br><br> Respondent; <br><br> VENTURA COUNTY HUMAN SERVICES AGENCY, <br><br> Real Party in Interest. | 2d Juv. No. B308849 <br> (Super. Ct. No. J072027) <br> (Ventura County) |

L.W. (mother) petitions for extraordinary writ relief from the juvenile court's order terminating reunification services for her minor child F.W. and setting the matter for a permanency planning hearing pursuant to Welfare and Institutions Code[1] section 366.26. Mother contends the court's order is not supported by substantial evidence. We deny the petition.

## FACTS AND PROCEDURAL HISTORY

Mother and A.W. (father)[2] are the natural parents of F.W. After mother gave birth to F.W. in February 2019, the child tested positive for methadone and was admitted to the natal intensive care unit for treatment of withdrawal symptoms. On February 21, 2019, the Ventura County Human Services Agency (HSA) filed a dependency petition alleging failure to protect (§ 300, subd. (b)). In its February 22, 2019 findings and order detaining F.W., the juvenile court stated among other things that "[t]he child's [two older] siblings are currently under legal guardianship with [the paternal grandparents] due to [the] parents' chronic substance abuse. The child's parents have failed to address the issues necessitating the legal guardianship of the siblings. The child, [F.W.], is at risk of similar abuse and neglect in the parents' care." The court also found that father "has unaddressed mental health issues" that "have led him to self-medicate and these actions periodically render him unable to safely care for the child."

On March 5, 2019, F.W. was discharged from the hospital and placed in a confidential foster home, where he has remained

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this writ proceeding.

2

throughout the dependency proceedings. In accordance with HSA's recommendation, mother and father were offered family reunification services and supervised visitation.

In its six-month review report, HSA stated that mother was complying with the requirements of her case plan, which included participation in Family Treatment Court (FTC), outpatient substance abuse treatment, attendance at AA meetings, and random drug testing. HSA noted that "[w]hile the mother has remained abstinent from substance use, behaviorally, she has made decisions that placed her recovery at risk for relapse and potentially place the child at risk for harm/danger. Specifically, the mother has struggled with her relationship with the presumed father . . . . [HSA] is worried of [*sic*] the authenticity of the mother's statements to separate and not plan to reunify with the presumed father, should the child return to the mother's care. . . . Additionally, the concept of honesty is a cornerstone of recovery with substance use and the mother's lack of transparency has also raised questions in terms of benefit from services. Should the mother continue to make dishonest statements, 'tell others what they want to hear,' and not follow through on tasks which benefit her and the child, additional treatment services may not help the mother be successful with managing her recovery and increase the risk of relapse."

HSA nevertheless recommended an additional six months of reunification services for both parents, and the court so ordered. Pursuant to HSA's recommendation, mother's visitation with F.W. was liberalized from supervised to monitored, with one hour of weekly visitation added for Therapeutic Visitation Center (TVC) services.

3

In its status report for the 12-month review hearing, HSA recommended that both parents be offered an additional six months of services. HSA stated that "[d]uring the reporting period, the mother found success in terms of the following: completing outpatient treatment services, completion of individual therapy, increase/liberalization of visitation, adherence to the recommendations made in the psychological evaluation, consistent and voluntary participation in Parent Advocate Services (PAS), modification and adherence to medication management, and engagement with [TVC] services . . . . The mother also self reports to be working, part time, as a writer and has discussed the possibility of working fulltime [*sic*]. The mother has also retained support from the maternal grandparents and remains living in their home. . . . The mother, as a whole, seems more confident in her needs and appearance, than in the past."

HSA concluded that F.W. could not yet be returned to mother's custody because "she has not yet demonstrated sufficient benefit from services which were chosen to mitigate the safety concerns that brought the family to the attention of this agency." HSA also "noted some worries in terms of the unclear nature of the relationship status between the mother and [the] presumed father. The mother has relayed that she intends to follow through with . . . divorc[ing] the presumed father but has not provided any details or information on how this process would take shape." HSA added that "the parent's [*sic*] ongoing communication is not a child welfare issue nor a criminal act. However, when the parents are communicating information pertaining to visitation and making efforts to coordinate without approval or consultation, worries are present in terms of

4

boundaries.  Additionally, the mother must continue with individual therapy . . . and must coordinate with [HSA] in terms of how she will access this resource."  HSA also noted that "[h]owever, the mother has made efforts in addressing components in her recovery and substance use treatment services which will allow [HSA] to further assess benefit and expand (liberalize) visitation."

At the conclusion of the February 21, 2020 12-month review hearing, the court granted both parents an additional six months of reunification services.  An interim review hearing was scheduled for April 16, 2020, to address liberalization of mother's visitation with F.W.

On March 30, 2020, in response to state and county orders regarding the COVID-19 pandemic, the presiding judge of the juvenile court issued an order temporarily suspending court-ordered in-person visits for dependent children and other minors in out-of-home placements.[3]  The order stated among other things that HSA was authorized to continue allowing in-person visits if no HSA employee had to be present, no one participating in the visit had exhibited symptoms of being exposed to COVID-19, and the child's current caregiver did not object.  The order further stated that "HSA shall make reasonable efforts to facilitate virtual visitation via telephone, cellphone, computer, Facetime, Skype, or other similar technology for non-physical contact in-lieu of any suspended court ordered in-person visits."  The order

---

[3] We grant HSA's request for judicial notice of the juvenile court's order and Emergency Rule 6, which was issued by the Judicial Council to provide guidance on visitation during the COVID-19 pandemic with children in out-of-home placements.

remained in effect until May 26, 2020, after which in-person visits were resumed.

At the 18-month review hearing, HSA and F.W.'s counsel both recommended that reunification services be terminated for both parents and that the matter be set for a section 366.26 hearing. Social worker Tiffany Guerra prepared HSA's report and testified at the contested hearing. Guerra concluded that mother had not met the objectives of her case plan since the last review hearing because she had missed seven random drugs tests and had twice tested positive for alcohol—on March 2, 2020, with a blood alcohol level of .02 percent, and again on July 21, 2020, with a blood alcohol level of .06 percent.

Guerra initiated the latter test the same day that father was admitted to the hospital for alcohol abuse. When asked to explain why she had missed drug tests, mother falsely claimed the testing sites were closed due to the pandemic. In July 2020, mother's counselor informed Guerra that she did not believe mother was being honest about her substance abuse. Mother claimed that the first positive test in March 2020 was due to her taking NyQuil, and denied the accuracy of the test conducted on July 21. There were also inconsistencies in mother's participation in substance abuse services, and she had missed medical appointments and minimized F.W.'s needs.

Because F.W.'s foster parents had objected to in-person visits after the order suspending such visits was entered, HSA arranged for virtual visits. When F.W.'s foster parents sent mother several emails to arrange for virtual visits with F.W., mother initially did not respond. Virtual visits were first offered on March 18, 2020, but due to mother's failure to respond the first such visit did not take place until April 8. When Guerra

6

spoke to mother on the phone on April 7, mother said she was resistant to participating it virtual visits because it made her feel sad and she was afraid she would cry and did not want to do so while on a video chat with the child. Mother added that she had not responded to the foster parents' emails because she was experiencing negative emotions about the fact that they would not agree to in-person visits.

On July 21, 2020, the paternal grandparents, who live in Thousand Oaks and are the guardians of mother and father's ten-year-old son P.W. and two-year-old daughter S.W., sent HSA a letter stating their observations regarding mother and father's progress and the benefit of the services they were receiving. The paternal grandparents stated their belief that mother and father "have not healed significantly from the underlying opioid . . . dependencies . . . and its debilitating impact on their abilities to function responsibility for the care of others."

The paternal grandparents also conveyed their concerns regarding "the ever-present risk of relapse and susceptibility to use other addictive substances" and mother and father's "denial of the impact their lifestyle has had" on their children. They noted that when P.W. came to live with them less than a year before F.W. was born, he "had never been to school, couldn't count to 10 or identify the letters on an eye chart, [and] had 9 cavities and an abscessed tooth." On his first day of school, "he told the whole class that he was accustomed to panhandling to help buy food for the family while they lived in their van parked behind Walmart." The parental grandparents also stated their opinions that "if [mother] had not been taken in by her parents last August and [father] had not secured government-assisted veterans housing they would still be homeless or worse." The

paternal grandparents went on to state their belief "that the interests of [F.W.] are better served by remaining with the foster caregivers . . . . With them, he has become accustomed to a stable, loving home and the additional support [and] care he needs."

In HSA's report for the 18-month review hearing, Guerra stated that mother "has shown success in completing and participating in many case plan services . . . . Although [mother] has demonstrated an overall improvement, [HSA] continues to have concerns that substance abuse issues were not truthfully addressed as well as the co-dependency between the parents. Despite their reports of remaining separate, their frequent communication, the father's reported alcohol abuse, and [mother's] positive alcohol testing results further evoke concerns with regard to [her] substance abuse and her receptive recovery. Additionally, [HSA] is concerned that the lack of insight regarding the developmental impacts the parent[s'] lifestyle has on their oldest child, places [F.W.] at risk for unconscious neglect."

Mother testified at the contested 18-month review hearing on her own behalf. She claimed that she had missed drug tests at the beginning of the stay-at-home orders because she "wanted to take the isolation [order] seriously" and "didn't want to put [her parents] in harm[']s way by leaving the house." She was currently taking Subutex for her methadone addiction but was in the process of tapering off the drug.

Mother continued to claim that her positive test for alcohol in March 2020 was due to her ingestion of NyQuil. She admitted for the first time, however, that she drank alcohol prior to the positive test she took in July and that she had "lied" to Guerra

8

about it. She claimed that she drank a mimosa with her sister at lunch that day before Guerra informed her that she needed to take a drug test. She acknowledged that Guerra had sent her a text in the morning, but claimed she did not see the text until the afternoon.[4]

Mother denied that she was still in a relationship with father. She claimed that she had served father with divorce papers and had sent the court a proof of service, but the court's records did not reflect that any proof of service had been filed. She denied any knowledge that father was continuing to abuse alcohol and other substances. She admitted that her parents did not know she was still having contact with father and did not support her being in a relationship with him. When asked why Guerra had seen her wearing her wedding ring, she offered that she had "left it on by accident from seeing [her] other children the day before" and had put it on for them "because they said we have to pretend like we're married."

After taking the matter under submission, the court found that reasonable services had been provided to mother but she did not fully comply with her case plan, that she had achieved only "moderate" progress toward alleviating the concerns that necessitated F.W.'s removal, and that there was a substantial risk of detriment to the child if he were returned to her care. The court stated: "It seems the COVID-19 pandemic and resulting

---

[4] On rebuttal, Guerra testified that she sent mother a text message at 8:36 a.m. informing her that she needed to submit to an on-demand drug test that day and asking her which testing cite she preferred. Four minutes later, mother sent a response stating "Westlake please." Two minutes later, Guerra responded, "Ok I'll submit now."

shelter-in-place orders had a negative effect on [mother's] progress up to that point and therefore on [HSA's] ability to consider expanding and liberalizing visits—a goal toward which it appeared the case was moving when the statewide emergency was declared."

The court continued: "But for one issue, there could be support for finding that the pandemic was a substantial factor in interfering with a parent's ability to continue to demonstrate case plan progress, and that it interfered with the ability to properly assess whether the mother should receive increased and liberalized visits. . . . [¶] But that one issue is very significant because it concerns the mother's honesty about her substance use." The court noted that mother had admittedly lied to Guerra about her alcohol use on July 21, and that "the truth of what happened and when it happened that day is much different from what the mother stated under oath."

The court posited that "[g]iven the true facts about when the mother knew she would have to test and when she ultimately did test on July 21st, either the mother had already consumed alcohol before knowing she was going to have to test that day, and she waited until the last moment to test, or she consumed alcohol after knowing she would have to test. Regardless, she failed to inform the social worker the truth, she failed to reach out to her supports, and she failed to tell the truth at trial." Regarding the March 2 positive alcohol test, the court noted that mother had claimed she tested positive "because she took NyQuil and at trial she elaborated on this story by explaining that she started taking NyQuil as a sleep aid after her hospitalization in February. However, the record of that test shows she submitted her urine sample that day at 3:36 p.m., long before she would

10

have needed an aid for normal nighttime sleep. Her explanation for this positive test is not credible."

The court further noted that "mother's dishonesty undermines her credibility on many other important matters. For example, she continues to insist she is not in a relationship with the father. Whether the parents remain in a committed relationship is significant to this case because the father has not been able to maintain his sobriety. The mother claimed that she did not even know the father has resumed consuming alcohol or that he was in a treatment program. The mother's statement is unlikely to be true." The court also found that mother's preferred explanation for missing drug tests in April and May was incredible and noted that "[i]n addition to misleading the social worker and the court regarding her alcohol consumption, the mother continues to deny ever having any problem with substance use and abuse, having any fear of relapse, and having any cravings or desire to use."

In finding that that returning F.W. to mother would create a substantial risk of detriment to the child, the court reasoned that "[n]either the mother nor the father has demonstrated substantial progress addressing their substance abuse issues. The mother's continued relationship with [F.W.'s] father threatens the mother's sobriety. . . . The mother's sobriety remains a significant concern especially since she has consumed alcohol, denied doing so and as late as this trial, continued to be dishonest about her conduct. There is no good cause to continue this hearing. It is unlikely that a continuance would allow the mother enough time to make behavioral changes necessary to have [F.W.] returned to her care. [F.W.] is entitled to a prompt resolution of his dependency status; he has been in a legally

11

unstable placement his entire life while the parents attempted to reunify with him." Accordingly, the court terminated services for both parents and set the matter for a section 366.26 hearing.

## DISCUSSION

Mother contends the juvenile court's order terminating reunification services is not supported by substantial evidence. She claims the evidence is insufficient to support the court's findings that she was provided reasonable services, that she did not fully comply with her case plan, and that returning F.W. to her custody would create a substantial risk of detriment to the child. We disagree.

Section 361.5, subdivision (a) provides in pertinent part: "For a child who, on the date of initial removal from the physical custody of the child's parent . . . , was under three years of age, court-ordered services shall be provided for a period of six months . . . but no longer than 12 months from the date the child entered foster care. [¶] . . . [¶]. [C]ourt-ordered services may be extended . . . not to exceed 18 months after the date the child was originally removed from physical custody of the child's parent . . . . The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of the child's parent . . . within the extended time period or that reasonable services have not been provided to the parent."

Based on a child's need for security and stability, the Legislature has set the 18-month review hearing as the cutoff date for family reunification services. (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788.) "At this hearing, the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising

12

a permanent plan for the children.  [Citation.]" (*Ibid*.)  The juvenile court may offer more than 18 months of reunification services if it finds that reasonable reunification services have not been offered or provided.  (*In re M.F.* (2019) 32 Cal.App.5th 1, 21.)  At the conclusion of the review period, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  The social worker shall have the burden of establishing that detriment."  (§ 366.22, subd. (a).)

We review the court's findings at the 18-month reviewing hearing for substantial evidence.  (See *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.)  In reviewing the challenged findings, we examine the record in the light most favorable to the juvenile court's order, to determine whether there is substantial evidence from which a reasonable trier of fact could have made the requisite findings.  (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483.)  We construe all reasonable inferences and resolve all conflicts in favor of the court's findings.  (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)  Issues of fact and credibility are the sole province of the juvenile court.  (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.)

Mother contends the evidence is insufficient to establish that reasonable services were offered because her in-person visits with F.W. were temporarily suspended due to the COVID-19 pandemic.  She asserts that "[v]irtual visits with an 18-month old is an extremely poor substitute for positive interactions and deeper bonding and attachment between a parent and child."

13

We are not persuaded. Whether the reunification services offered were reasonable and suitable is judged according to the circumstances of the particular case. (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

We conclude that substantial evidence supports the juvenile court's finding, by clear and convincing evidence, that HSA offered or provided reasonable reunification services to mother. Although we do not dispute that the temporary suspension of in-person visits in favor of virtual visits was not ideal, it was warranted by the circumstances of the COVID-19 pandemic. Mother also downplays the significance of the fact that from March 18 until April 7, she ignored the foster parents' repeated offers to participate in virtual visits with F.W. Because she initially refused to participate in virtual visits, she cannot be heard to complain that such services were unreasonable. Moreover, the order restricting in-person visits expired on May 26, and mother's in-person visits with F.W. resumed shortly thereafter. Under the circumstances, the visitation offered by HSA was reasonable. (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547.)

The evidence also supports the court's finding that mother did not fully comply with her case plan. Over two weeks before the stay-at-home orders went into effect, mother tested positive for alcohol. She also missed numerous drug tests and refused to participate in virtual visitation for almost three weeks. Moreover, her failure to fully comply with her case plan supports

14

the finding that F.W. would suffer detriment in he were returned to mother.  (*Robert L. v. Superior Court* (1996) 45 Cal.App.4th 619, 625.)

In any event, a parent's substantial compliance with a reunification services plan does not preclude a finding that the child would suffer detriment if returned to the parent. (*Constance K. v. Superior Court*, *supra*, 61 Cal.App.4th at p. 704.) "[T]he court must also consider progress the parent has made toward eliminating the conditions leading to the children's placement out of home."  (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141-1142.)  Here, substantial evidence supports the court's finding that mother had not made sufficient progress in eliminating the conditions that necessitated F.W.'s removal, such that the child would suffer detriment if returned to her.  As the court found, mother has a serious credibility problem.  She first tested positive for alcohol over two weeks before the stay-at-home orders went into effect, which undermines her claim that those orders were the cause of her relapse.  Moreover, she continued (and apparently still continues) to lie about her first relapse. Although she finally admitted her second relapse during her testimony at the hearing, she was plainly dishonest about the circumstances of that relapse.  As the juvenile court aptly put it, "[t]he mother's sobriety remains a significant concern especially since she has consumed alcohol, denied doing so and as late as this trial, continued to be dishonest about her conduct."  Mother also continued to be dishonest about her relationship with father, who does not appear to be committed to maintaining sobriety.  In light of this evidence, the court did not err in finding that F.W. could not be safely returned to mother.

15

## DISPOSITION

The petition for an extraordinary writ is denied.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P.J.

YEGAN, J.

16

Tari L. Cody, Judge
Superior Court County of Ventura

_____

Denise M. Trerotola, under appointment by the Court of Appeal, for Petitioner.

Michael G. Walker, County Counsel, Joseph J. Randazzo, Assistant County Counsel, for Real Party in Interest.

No appearance for Respondent.